## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**CARL FERRELL,**

        **Plaintiff,**

**v.**                                                                    **Case No.: 3:11-cv-00503**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is assigned to the Honorable Robert C. Chambers,  United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7 and 8).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that the Commissioner's motion be granted, that plaintiff's motion be denied, and that this case be dismissed, with prejudice, and removed from the docket of the Court.

1

## I.     Procedural History

Plaintiff, Carl Ferrell (hereinafter "Claimant"), filed an application for DIB on September 28, 2008, alleging a disability onset date of August 1, 2008 due to a degenerative spinal condition, bulging discs, sciatica, a herniated nucleus pulposis at L5-S1, and anxiety. (Tr. at 212). The Social Security Administration (hereinafter "SSA") denied Claimant's application on January 29, 2009. (Tr. at 44–48). Claimant filed a request for reconsideration, which was also denied. (Tr. at 50–52). Claimant then requested a hearing in front of an Administrative Law Judge (hereinafter "ALJ"), which was held before the Honorable James Toschi, ALJ, on December 10, 2010. (Tr. at 25–41). By written decision dated December 23, 2010, the ALJ denied Claimant's DIB claim. (Tr. at 12–24). The ALJ's decision became the final decision of the Commissioner on May 26, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–5). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (ECF Nos. 5–8). Consequently, this matter is ripe for resolution.

## II.     Relevant Evidence

Claimant was 55 years old at the time he filed for DIB. He had a college education, was fluent in English, and previously owned and operated his own accounting practice. Claimant supplied medical records detailing treatment he received beginning in December 1996 and continuing through November 2010. The undersigned has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment

2

and evaluations to the extent that they are relevant to the issues in dispute.

### A.     Treatment Records

1.     *Prior to Disability Onset Date*

On December 2, 1996, a MRI of Claimant's lumbar spine was taken at Tri-State MRI and interpreted by Dr. Dennis Burton. (Tr. at 278). Dr. Burton observed degenerative changes throughout Claimant's lumbosacral region with some narrowing at L3-L4 and L4-L5; minimal bulging annulus at L3-L4 and moderate bulging at L4-L5; a herniated nucleus pulpous at L5-S1 with a prominent left lateral bulging; and significant spinal stenosis at the L5-S1 level. (*Id.*).

On April 18, 1997, Claimant was seen at the Lexington VA Medical Center (VAMC) for a follow-up appointment concerning his back pain. (Tr. at 414). Claimant reported back spasms with continuing sharp pain radiating down into his right buttock and knee. (*Id.*). Claimant denied having numbness in his extremities and stated that lying down helped alleviate the pain. (*Id.*). Claimant was diagnosed with a herniated disk at the L5-S1 level. (*Id.*).

On January 10, 2006, Claimant presented to the Huntington VAMC as a walk-in patient with complaints of chronic lower back pain. (Tr. at 343–47). On intake, Lisa Sifford, R.N. documented that Claimant had sufficient energy to perform his activities of daily living and had no new functional limitations with a limb or ambulation. (Tr. at 347). Claimant's depression screen was negative. (Tr. at 344). He was examined by Dr. Daniel Tolciu, who diagnosed Claimant with osteoporosis by history. (Tr. at 345). Dr. Tolciu noted that Claimant used Naproxen and other non-steroidal anti-inflammatory medications for relief of his chronic lower back pain and advised "judicious use" of those medications. (*Id.*).  Dr. Tolciu provided Claimant

3

with Ultram as an alternative for pain control.

On January 16, 2006, Claimant went to the Community Health Foundation Clinic complaining of anxiety and requesting medication. (Tr. at 279). Claimant reported a history of occasional panic attacks for which he had been prescribed Ativan in the past. (*Id.*). However, he did not take the medication very often and his prescription had expired.  Claimant denied having suicidal or homicidal thoughts and had no significant physical findings.  He was prescribed Ativan for his anxiety. (*Id.*).

On March 16, 2006, Claimant was involved in a motor vehicle accident.  He presented to the Emergency Department at Logan Regional Medical Center. The Emergency Physician ordered x-rays of Claimant's cervical spine, which were reviewed by Dr. Rajendra Valiveti, M.D. (Tr. at 415). Dr. Valiveti observed degenerative changes of the cervical spine with disc space narrowing at C5-C6 and C6-C7. (*Id.*). Dr. Valiveti noted that the pedicles were intact and that there was no evidence of any fractures. (*Id.*). Dr. Valiveti further stated that Claimant's lungs, heart, and mediastinum were all unremarkable and that Claimant's bony structures were intact. (*Id.*).

On May 1, 2006, Claimant was examined by Dr. Joye Martin at the Huntington VAMC. (Tr. at 336–38). Claimant complained of bilateral scapular pain in the area of the subscapular bursa but reported that his current pain score was zero on a numerical scale of zero to ten, with ten being the worst pain. (Tr. at 336). Claimant explained that he had taken Naproxen and the pain had resolved. (*Id.*). Dr. Martin noted that Claimant was in a motor vehicle accident on March 16, 2006, which likely contributed to his current pain symptoms. (*Id.*). X-rays taken after the accident showed no acute fractures, although Claimant was told he had arthritis in his cervical

spine. Claimant denied having pain in his neck at the time of the visit. (*Id.*). Dr. Martin observed that Claimant's lower back pain was stable. (*Id.*). Claimant discussed his history of osteoarthritis with Dr. Martin and requested a DEXA scan to monitor its progression. Dr. Martin diagnosed Claimant with bursitis of the shoulders, arthritis, and osteoporosis. She instructed Claimant to continue taking Naproxen as needed and to return in six months.

On November 9, 2006, Claimant returned to the Huntington VAMC for a follow-up appointment. (Tr. at 329–30). Dr. Martin noted that Claimant was "in good spirits" and reported a pain score of zero. (Tr. at 329). Claimant's depression screen was also negative. Claimant advised Dr. Martin that he had occasional anxiety attacks for which he had been prescribed Ativan in the past. He stated that his most recent anxiety attack occurred in September 2006. (*Id.*). Claimant denied chest pain or shortness of breath although he did continue to experience some discomfort in both shoulders. (*Id.*). Dr. Martin diagnosed Claimant with bursitis in the shoulders, arthritis, and osteoporosis. (*Id.*). She ordered a DEXA scan to monitor Claimant's osteoporosis and instructed him to continue his current medications and return in six months.

Claimant returned to the Huntington VAMC for x-rays of his hip, pelvic region, and lumbar spine on December 12, 2006. (Tr. at 285–86). X-rays of Claimant's hips and pelvic region were reviewed by Kellie King Gooding, MD. (Tr. at 284–85). Dr. Gooding observed that Claimant's hip joints were well-maintained. (Tr. at 285). Enthesophyte formation was present at the right femoral and greater trochanter in addition to spurring at the ischial tuberosities. (*Id.*). A small probable bone island was noted at the left femoral intertrochanteric region. (*Id.*). With respect to

Claimant's lumbar spine, Dr. Gooding found a Schmorl's node at the T11-T12 and T12-L1 levels. (Tr. at 286). The x-rays evidenced signs of moderate disc space narrowing at L1-L2 and L3-L4 with moderate to severe narrowing at L4-L5 and L5-S1. (*Id.*). Dr. Gooding further observed sclerotic end plate changes at L4-L5 and L5-S1, disc narrowing at T12-L1, and mild levocurvature of the lumbar spine. (*Id.*). Dr. Gooding diagnosed Claimant with multilevel degenerative changes and degenerative disc disease. (*Id.*). The DEXA scan evidenced signs of osteoporosis and confirmed that Claimant was at a high risk for bone fractures. (Tr. at 287).

On July 13, 2007, Claimant again presented to the Huntington VAMC for routine follow-up. (Tr. at 314–17). Dr. Martin observed that Claimant was in good spirits with a pain score of zero. (Tr. at 314). He reported no chest pain or shortness of breath. (*Id.*). Dr. Martin noted Claimant's history of anxiety and panic attacks and documented that Claimant kept "ten Ativan on hand for emergencies." (*Id.*). She advised Claimant that the DEXA scan taken in December 2006 conclusively confirmed the existence of osteoporosis. (*Id.*). Dr. Martin diagnosed Claimant with anxiety disorder, osteoporosis, and arthritis. She wrote a prescription for Ativan and told Claimant to continue taking his other medications and return in four months.

On November 26, 2007, Claimant was seen by Dr. Girma Meshesha at the Huntington VAMC. (Tr. at 307-09). Claimant had no complaints, but requested another DEXA scan to keep track of his osteoporosis. The scan and other medical imaging were performed on December 20, 2007 and showed a small probable bone island at the left femoral intertrochanteric region with no acute bone injury. (Tr. at 282-84). A calcific density was observed at the right femoral greater trochanter. (*Id.*). Claimant had decreased bone mineral density; a Schmorl node at T12-L1; mild disc

space narrowing at L1-L2 and L3-L4, and moderate to severe narrowing at L4-L5 and L5-S1; and signs of further degeneration at the L4-L5 level. (*Id.*). The DEXA scan confirmed that Claimant remained at a high risk of bone fracture. (Tr. at 284).

On January 11, 2008, Claimant saw Dr. Meshesha to discuss the results of his medical imaging. (Tr. at 303–05). Claimant was in no acute distress, had a negative depression screen, and a pain score of zero. Dr. Meshesha diagnosed Claimant with osteoporosis, arthritis, and anxiety disorder and noted that Claimant was taking Ativan as needed. (Tr. at 304). She instructed Claimant to continue with his current medications and return in six months.

On February 15, 2008, Claimant was seen by Dr. David Patrick at Huntington Internal Medicine Group ("HIMG"). (Tr. at 353). The record reflects that Claimant had been a long time patient of HIMG and received periodic evaluation and care for chronic medical conditions including irritable bowel syndrome, osteoporosis, and situational anxiety. Claimant complained of abdominal pain and a flare up of his right lower quadrant pain. (*Id.*). Dr. Patrick concluded that Claimant's pain symptoms were likely caused by irritable bowel syndrome with a possible musculoskeletal component based on past reports of right hip pain. (*Id.*). Dr. Patrick recommended that Claimant modify his diet. If his pain persisted, Claimant was told to consider a colonoscopy versus a CT scan of his pelvis and abdomen.

On April 7, 2008, CT scans of Claimant's pelvic region and abdomen were performed at the Huntington VAMC. (Tr. at 280–81). Claimant's lower thoracic structures were unremarkable and his organ systems were generally normal, with no evidence of kidney stones, diverticulitis, or gastrointestinal abnormality. However, he was found to have bilateral inguinal hernias. (Tr. at 281).

7

2.     *Relevant Time Period*

On August 27, 2008, Claimant returned to the Huntington VAMC with complaints of pain in his right groin and some blood in his urine.  He reported having this pain off and on since the 1970s.  A cystoscopy showed chronic inflammation but not cancer. Still, Claimant was concerned about the chronic inflammation in view of his brother's history of bladder cancer. Claimant was seen by Samantha Carroll, a Physician's Assistant with the VAMC's primary care clinic.. (Tr. at 291–94). Ms. Carroll noted that Claimant continued to suffer from osteoporosis and occasional panic attacks, but indicated that ten Ativan generally lasted him six months. Claimant reported having sufficient energy to perform his activities of daily living and denied any new functional impairments or limitations. (*Id.*).  Ms. Carroll ordered a urinalysis and other screening laboratory studies.

On March 3, 2009, Claimant was seen by James O'Connor, Jr., a Physician's Assistant at the Huntington VAMC. (Tr. at 382–85). Claimant advised that he was there for a routine visit and had no acute complaints, but did want to discuss the chronic inflammation found on his recent cystoscopy. He advised that he was followed in the primary care clinic for his chronic conditions. Mr. O'Connor observed that Claimant suffered from chronic osteoporosis, arthritis, and anxiety, but his anxiety was "controlled" and his depression screen was negative (*Id.*). Claimant reported a pain score of three.  On examination, Mr. O'Connor noted no signficant findings. He refilled Claimant's prescription for Naproxen, ordered routine laboratory studies, and instructed Claimant to return in six months.

On September 8, 2009, Claimant returned to the primary care clinic at the Huntington VAMC for follow-up of the laboratory test results and for review of his

chronic conditions. (Tr. at 513–16). Claimant was seen by Luella Gillispie, CFNP, who recorded that Claimant had broken his collar bone in a motor vehicle accident in June. (Tr. at 513). Claimant reported that he was "doing ok today;" he did not feel depressed, had sufficient energy to perform his activities of daily living, and did not have any new functional impairments. Nurse Gillispie reviewed the results of Claimant's laboratory studies with him as well as an ultrasound of his bladder, which was reported as normal. She assessed Claimant as suffering from osteoporosis, anxiety, arthritis, and lower back pain. (*Id.*). (Tr. at 518).

On September 17, 2009, Claimant was seen by Dr. Patrick for an annual evaluation at HIMG. (Tr. at 440–41). Claimant informed Dr. Patrick about his motor vehicle accident and broken collarbone, but indicated that he was "doing fine." Claimant reported chronic right lower quadrant pain and aching in his joints. (Tr. at 440). Dr. Patrick reviewed Claimant's laboratory results with him, noting an absence of blood in the urine. He recorded Claimant's history of irritable bowel syndrome, osteoporosis, and situational anxiety, but made no treatment changes. (Tr. at 441). Dr. Patrick told Claimant to continue with his annual visits to monitor his chronic conditions and obtain his routine laboratory studies at the VAMC.

On February 4, 2010, Claimant returned to the Huntington VAMC for review of his chronic conditions. He complained of having of left shoulder pain since November 2009 and rated his pain as a six out of ten. (Tr. at 507–10). Claimant stated that he took Naproxen for his pain. (Tr. at 507). Dr. Shahnaz Rumman examined Claimant and observed that his range of motion in his left shoulder was slightly restricted on hyperextension. (Tr. at 508). Claimant indicated satisfaction his regimen of pain management, but did request an MRI of his shoulder. (Tr. at 510).

9

Accordingly, Dr. Rumman ordered medical imaging of Claimant's shoulder.

On March 4, 2010, x-rays of Claimant's lumbar spine and pelvic region were taken to monitor his osteoporosis. (Tr. at 418–19). The films reflected a decrease in Claimant's bone mineral density; Schmorl nodes at T11-T12 and T12-L1; severe disc space narrowing at L5-S1; moderate to severe disc space narrowing at L4-L5; and moderate disc space narrowing at L3-L4. (*Id.*). Small bone islands were observed in the right inferior ilium and the left femoral intertrochanteric region. (*Id.*). The bursal calcification at the right femoral greater trochanter had increased in size since the previous pelvic x-ray in December 2007. (*Id.*). A bone density scan confirmed that Claimant continued to be at high risk for bone fractures. (Tr. at 420). X-rays of Claimant's left shoulder area showed a healed left rib fracture and small bone islands in the left fourth, fifth, and seventh ribs. (Tr. at 465). The x-rays revealed no acute fractures or dislocations; the acromioclavicular and glenohumeral joints were maintained; and the subacromial space was not narrowed. (*Id.*).

On April 19, 2010, Claimant returned to the Huntington VAMC with continued complaints of left shoulder pain and a limited range of motion. (Tr. at 484–85). Claimant reported a pain score of three. (Tr. at 484). An orthopedist, Dr. Ernesto Nieto, examined Claimant's left acromioclavicular ("AC") joint, noting tenderness to palpitation, but no separation in the joint. (Tr. at 485). Based on Claimant's history and physical examination, Dr. Nieto concluded that Claimant had suffered a non-displaced fracture of the collarbone in the June motor vehicle accident, which had now healed.  His suspicion was confirmed by x-ray. Dr. Nieto diagnosed a healed fracture of the left clavicle and a rotator cuff tear of the left shoulder. He recommended range of motion exercises and an MRI of Claimant's shoulder. (*Id.*).

10

On April 27, 2010, Claimant was seen at the Huntington VAMC for evaluation by an occupational therapist. (Tr. at 486–88). Claimant presented with decreased strength throughout his left upper extremity. (Tr. at 487). Despite this, Claimant reported that he was independent with all of his activities of daily living. (*Id.*). Claimant stated that his shoulder pain had subsided in the prior three weeks and he did not experience any numbness or tingling in his extremities. (*Id.*). Jessica Fritz, OTR, performed range of motion testing. Claimant rated his pain as a one when at rest and a four with range of motion testing. Ms. Fritz discussed a home exercise program with Claimant and noted that the potential benefit from rehabilitation was fair to good. (Tr. at 488).  She instructed Claimant to return in one month.

On April 28, 2010, a MRI of Claimant's left shoulder was taken. (Tr. at 421–22). Dr. Thomas Zekan reviewed the MRI and observed narrowing and minimal osteophyte formation in the AC joint. (Tr. at 421). Claimant's osseous structure, rotator cuff, and glenoid labrum were otherwise intact. (*Id.*). Claimant was diagnosed with AC joint degeneration and a mild abnormal signal suggesting a tendonitis and/or a partial tear of the supraspinatus tendon. (Tr. at 421–22).

On June 15, 2010, Dr. Nieto re-examined Claimant at the Huntington VAMC. (Tr. at 494–95). Claimant reported no pain symptoms and his physical examination revealed a normal range of motion. (Tr. at 494). The MRI evidenced a partial supraspinatus tear that Dr. Nieto believed would not significantly progress. (Tr. at 495). Claimant was advised to continue his range of motion exercises. (*Id.*). Dr. Nieto also noted that Claimant had returned to his job as an accountant. (*Id.*).

On September 3, 2010, Claimant returned to the Huntington VAMC for a follow-up appointment with Dr. Rumman. (Tr. at 425–26). Claimant had no specific

complaints although his pain score was two. Dr. Rumman noted that Claimant suffered from anxiety and a partial tear of the supraspinatus. (Tr. at 426). However, Claimant did not report any signs of depression and confirmed that he had sufficient energy to perform his activities of daily living and that he had no new functional impairments or limitations. (Tr. at 491-92). He took Ativan as needed with his last prescription having been written a year earlier.  He was instructed to return to the clinic in January 2011 and to obtain routine laboratory studies.

On November 15, 2010, Claimant presented to the Huntington VAMC with complaints of pain in both knees and continuing pain in his left shoulder. He indicated that his knee pain had been present for several months and was getting worse.  He stated that the pain woke him up at times. (Tr. at 553–55). Claimant rated the pain in his knees as a four to five on the ten point pain scale. According to Claimant, the pain in his knees was intermittent and alternated between dull and sharp. (*Id.*). Claimant also reported pain in his left shoulder, which was aching and dull and occurred intermittently. (Tr. at 553–54). X-rays of Claimant's knees were taken and revealed mild narrowing of the medial femorotibial compartment in the left knee; spurring at the insertion of the quadriceps tendon; but an absence of acute bone injury. (Tr. at 544-47). Examination of Claimant's right knee showed mild narrowing of the medial femorotibial compartment with a small to moderate suprapatellar effusion and spurring at the insertion of the quadriceps tendon. (*Id.*). Claimant was diagnosed with degenerative changes and suprapatellar effusions that were more pronounced on the right. (*Id.*).

**B.     Agency Records**

1.     *Physical Health*

On January 23, 2009, Caroline Williams, M.D., completed a physical residual functional capacity assessment at the request of the SSA. (Tr. at 356–63). Dr. Williams reviewed Claimant's medical records concerning his treatment for lower back pain but was unable to assess the severity of Claimant's alleged impairments in light of his failure to provide additional information as requested. (Tr. at 363).

On July 8, 2009, Uma Reddy, M.D., completed a second physical residual functional capacity assessment at the request of the SSA. (Tr. at 402–09). Dr. Reddy found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight hour day, sit for six hours in an eight hour day, and was unlimited in his ability to push or pull. (Tr. at 403). Claimant's postural limitations restricted him to activities that required only occasional balancing, stooping, kneeling, crouching, and crawling. (Tr. at 404). Dr. Reddy found that Claimant was not limited in any manipulative, visual, or communicative functions. (Tr. at 405–06). Claimant's environmental limitations required him to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery and heights. (Tr. at 406). Dr. Reddy concluded that Claimant was only partially credible based on the supporting medical evidence. (Tr. at 407). Dr. Reddy credited Claimant with physical limitations as set forth in the RFC but noted that Claimant did not satisfy any listing limitation and had no significant neurological deficits and took only over-the-counter medications for pain relief. (*Id.*). She recorded Claimant's activities of daily living as including light level exertional work; such as, performing self care, driving, and running errands. (*Id.*).

2.      *Mental Health*

On January 24, 2009, Debra Lilly, PhD, completed a psychiatric review technique at the request of the SSA. (Tr. at 364–77). Dr. Lilly noted Claimant's history of anxiety but found that there was insufficient medical evidence to adjudicate the claim. (Tr. at 376). She documented efforts she had made to contact Claimant for additional information to no avail. (*Id.*).

On July 7, 2009, Jeff Harlow, PhD, completed a psychiatric review technique at the request of the SSA. (Tr. at 388–401). Dr. Harlow found that Claimant had a documented anxiety-related disorder, but it was not a severe impairment. (Tr. at 388). Dr. Harlow evaluated Claimant's functional limitations and found that Claimant had no restriction of activities of daily living; no difficulty in maintaining social functioning; no difficulty in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation. (Tr. at 398). Dr. Harlow found that the evidence did not establish the presence of paragraph "C" criteria. (Tr. at 399). He noted that Claimant's medical records included a diagnosis of anxiety disorder, which was controlled with Ativan, and Claimant had only infrequent anxiety attacks. (Tr. at 400). Dr. Harlow concluded that all of Claimant's key functional capacities were within normal limits. (*Id.*). He discounted Claimant's comments regarding the extent of his limitations, indicating that they were "extremely inconsistent" with the clinical results. (*Id.*). Consequently, Dr. Harlow found Claimant to be only partially credible. (*Id.*).

## III.   __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir.

1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when

considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since August 1, 2008, the date of the alleged onset of disability. (*Id.*, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: degenerative disc disease of the back and arthritis in the hips and knees. (*Id.*, Finding No. 3). The ALJ assessed Claimant's shoulder impairment and anxiety disorder, but found them to be non-severe. He observed that Claimant's shoulder pain had resolved and his anxiety caused no more than a minimal limitation in Claimant's ability to perform basic mental work activities. (Tr. at 14-15). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that Claimant: could not climb ladders, ropes, or scaffolds; should avoid kneeling and crawling; could only

16

occasionally climb ramps and stairs, balance, stoop, and crouch; should avoid concentrated exposure to extreme heat, extreme cold, and vibration; and should avoid all exposure to hazards such as heights and moving machinery. (Tr. at 16, Finding No. 5).

The ALJ analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 20, Finding Nos. 6–7). With the assistance of a vocational expert, the ALJ concluded that Claimant was capable of performing his past relevant work as an accountant. (*Id.*, Finding No. 6). Therefore, the ALJ concluded that Claimant was not disabled under the Social Security Act. (*Id.*, Finding No. 7).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ failed to fully develop the record regarding Claimant's anxiety; in particular, he failed to order a psychological consultative examination and (2) the ALJ's credibility finding was erroneous. (ECF No. 7 at 2–6).

## V.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*,

368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## VI.    <u>Analysis</u>

### A.    Duty to Develop the Record

First, Claimant argues that the ALJ failed to fully develop the record regarding his anxiety. According to Claimant, the mental health record was limited to a few brief progress notes by Claimant's treating physicians and lacked any in-depth mental health evaluation. Thus, the record was undeveloped and ambiguous. For that reason, the ALJ should have arranged for a psychological evaluation before concluding that Claimant's mental impairment was non-severe. In response, the Commissioner contends that the record contains sufficient objective evidence upon which to assess Claimant's allegations. Moreover, the Commissioner emphasizes that Claimant's counsel had an affirmative duty to submit all of the relevant evidence supporting his client's claim of disability; the ALJ did not have the burden to establish non-

disability.

Claimant correctly states that "Social Security proceedings are inquisitorial rather than adversarial," *Richardson v. Perales,* 402 U.S. 389, 391 (1971). As such, an ALJ has the duty to fully and fairly develop the record. However, this duty does not require the ALJ to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994); *see also Reed v. Massanari,* 270 F.3d 838 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000). To the contrary, an ALJ has the right to presume that Claimant's counsel provided the key medical documentation and presented Claimant's strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417, at *4 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987)). The burden of producing medical evidence to establish disability is on Claimant, not the ALJ. *See Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987) (explaining that "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so"); 20 C.F.R. § 404.1512(a) ("[Y]ou must furnish medical and other evidence that we can use to reach conclusions about your medical impairment[s]."). Thus, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001).

When considering the adequacy of the record, the undersigned must look for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand or reversal is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. Instead,

the decision of the ALJ will not be overturned "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

In the present case, Claimant does not identify with particularity any gaps in the treatment records that resulted in "unfairness or clear prejudice." *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). Similarly, Claimant provides no sound basis upon which a reviewing court could conclude that a psychological evaluation might reasonably have altered the result of the Commissioner's decision. *See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). At the time the matter was submitted to the ALJ, Claimant's attorney presumably believed that the record was sufficiently well developed to allow the ALJ to reach a fair decision. Counsel did not advise the ALJ of any missing treatment records; did not request the ALJ's assistance in obtaining additional records; did not request that the record be held open for submission of any additional evidence; and did not seek an independent psychological evaluation. Certainly, had significant evidentiary gaps been apparent at the administrative hearing, Counsel would have requested supplementation. "Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008); *see also* Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d).

Moreover, a review of the Transcript of Proceedings confirms that the relevant medical information regarding Claimant's anxiety was available to the ALJ and was unambiguous. The Transcript contains treatment records spanning a period of five

(5) years, which document Claimant's regular visits to his primary care providers at the VAMC and HIMG. These records provide a chronological and longitudinal view of Claimant's care and reflect no significant lapses in time or treatment.  The office and clinic notes document that Claimant had a longstanding history of anxiety that caused periodic, but infrequent, anxiety attacks. They also confirm that Claimant was able to control his attacks by taking Ativan as needed. There are no notations suggesting that Claimant needed a referral to a psychologist for evaluation, intensive psychiatric counseling, an inpatient mental health admission, crisis intervention, or a more complex medication regimen. Claimant never sought such evaluation or treatment, and no health care provider recommended it. Consequently, the ALJ had no reason to conclude that a comprehensive psychological evaluation was necessary.

The ALJ's written decision provides additional evidence that he had sufficient information upon which to determine that Claimant's anxiety disorder was not a severe impairment.  The ALJ carefully reviewed and considered Claimant's treatment records, Adult Disability and Function Reports, and the consultative opinions before reaching a conclusion regarding the severity and limiting effects of Claimant's mental impairment. These documents supply more than adequate information upon which to assess the functional impact of Claimant's anxiety. The treatment notes confirm the objective medical diagnosis of anxiety disorder, provide information about the frequency that Claimant suffered anxiety attacks, set out his treatment protocol, and record the recommendations of his physicians. Clearly, Dr. Patrick, Dr. Martin, Dr. Meshesha, and Physician's Assistants Carroll and O'Connor were aware of Claimant's anxiety disorder and had a plan of treatment in place to address his periodic anxiety attacks. None of these health care providers suggested a comprehensive psychiatric

21

evaluation or referral to a psychiatrist, new or additional medications, outpatient psychotherapy, or inpatient care. Uniformly, they recommended only that Claimant continue taking Ativan as needed.  In regard to the Disability and Function Reports, Claimant's descriptions of his daily activities were considered by the ALJ and were useful to his determination.  The ALJ noted that Claimant engaged in normal daily activities without substantial difficulty. He completed his personal hygiene tasks without assistance; drove an automobile and ventured out alone; completed household chores; watched television; read and visited the library; regularly communicated with family members; ate out with his wife occasionally; and managed the family finances. Finally, the ALJ considered the psychiatric review technique completed by Dr. Harlow, which was another piece of evidence that was consistent with the treatment notes and Claimant's description of his daily activities. Dr. Harlow opined that Claimant's anxiety was a non-severe impairment because no evidence existed to establish that it limited any of Claimant's key functions. (Tr. at 388–401).

Further, at the administrative hearing, the ALJ questioned Dr. Joseph Carver, a medical expert, regarding his opinion of the severity of Claimant's mental impairment. (Tr. at 32–33).  Having reviewed the medical record, Dr. Carver testified that Claimant had received limited mental health treatment over the years and none of the treatment constituted a significant psychiatric intervention. (*Id.*). Dr. Carver agreed with the agency consultant that Claimant's anxiety was a non-severe impairment. (Tr. at 33). Counsel for Claimant made no inquiry of Dr. Carver, but subsequently questioned Claimant regarding his anxiety and its functional consequences. (Tr. at 37–38). Claimant's testimony did not uncover any new evidence nor indicate the need for further development of the record.

22

In light of the record before the ALJ, a consultative examination was not required in this case. 20 C.F.R § 404.1519a(b) sets forth conditions under which the Commissioner can order a consultative examination:

> We *may* purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we *might* purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
>
>> (1) The additional evidence needed is not contained in the records of your medical sources;
>>
>> (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
>>
>> (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
>>
>> (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

(emphasis added).

Under this regulation, an ALJ has discretion to decide whether to order a consultative examination after determining whether the existing record contains sufficient evidence to support a decision on the individual's claim. *See Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003); *Sims v. Apfel*, 224 F.3d 380, 381 (5th Cir. 2000). A reviewing court should defer to the ALJ's decision not to arrange a consultative examination upon finding that the record contains sufficient evidence to make a decision. *See Keplinger v. Astrue*, 2008 WL 4790663, at *5 (W.D.Va. Nov. 3, 2008) (citing *Wren v. Sullivan*, 925 F.2d 123 (5th Cir. 1991)). The Transcript of

23

Proceedings simply does not demonstrate any gap, inconsistency, or ambiguity. While the records pertaining to Claimant's anxiety are not voluminous, they are sufficient to reasonably conclude that Claimant's mental impairment was not severe. "The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983); *see also Bostic v. Astrue*, 2011 WL 3667219, at *5 (W.D.N.C. July 22, 2011) (holding same). Thus, the ALJ's finding that Claimant's longstanding anxiety, while present, causes no more than an infrequent and minimal disruption in his ability to function was supported by substantial evidence.

Consequently, the undersigned **FINDS** that the record before the ALJ was adequately developed and further **FINDS** no prejudicial gaps or inconsistencies in the record upon which to conclude that a psychological evaluation was necessary and may have altered the result of the Commissioner's decision. Therefore, a reversal or remand on this ground is not unwarranted.

### B.    Credibility

Next, Claimant argues that the ALJ committed reversible error by failing to properly acknowledge Claimant's subjective descriptions of pain and, instead, by relying almost exclusively on objective medical evidence to discount the severity and limiting effects of Claimant's pain. Claimant points out that no objective test or piece of equipment exists with which to accurately measure pain; therefore, undue focus on objective findings unfairly discredits the importance and validity of subjective descriptions of pain.

In *Hines v. Barnhart,* the Fourth Circuit reiterated its long-held standard governing the role of subjective evidence in proving the intensity, persistence, and

disabling effects of pain, stating "[b]ecause pain is not readily susceptible of objective proof, however, *the absence of objective medical evidence of the intensity, degree or functional effect of pain is not determinative."* 453 F.3d at 564–565 (emphasis in original). Hence, once an underlying medical condition capable of eliciting pain is established by objective medical evidence, disabling pain can be proven by subjective evidence alone. Nonetheless, this standard does not require the ALJ to ignore objective evidence that implies the intensity or degree of pain. To the extent that objective evidence exists, the ALJ should consider it. Moreover, in determining the weight to give to subjective descriptions of pain, the ALJ must consider the credibility of the claimant.

Social Security Ruling 96-7p was promulgated to explain the two-step process by which an ALJ must evaluate symptoms, including pain, in order to determine their limiting effects on a claimant. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.*

Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the

25

credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[1] any objective medical evidence of pain[2] (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[3] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996).

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessment for that of the ALJ; rather, the Court must review the record as a whole and determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

---

[1] *See* 20 C.F.R. § 404.1529(c)(1).

[2] *See* 20 C.F.R. § 404.1529(c)(2).

[3] *See* 20 C.F.R. § 404.1529(c)(3).

Having reviewed the Transcript of Proceedings, including the ALJ's written decision, the undersigned finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Rulings and is supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints of pain *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Significant evidence existed in the record that Claimant's complaints of disabling pain and other symptoms did not correlate with the objective medical evidence or with his own descriptions of his daily activities.

At the outset of the two-step process, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the pain and symptoms described by him. (Tr. at 16). However, the ALJ deemed Claimant's descriptions of the persistence, severity, and intensity of the pain not to be fully credible in light of inconsistencies between Claimant's subjective complaints and the remainder of the record. (Tr. at 17). The ALJ reviewed Claimant's written statements and oral testimony concerning his mental and physical impairments. (Tr. at 16–17). Subsequently, the ALJ compared Claimant's subjective statements to the objective medical evidence. (Tr. at 17–20). The ALJ discussed Claimant's treatment records at length, particularly those from Dr. Patrick and the Huntington VAMC. The ALJ emphasized that Claimant's physical impairments were largely unchanged from their initial diagnosis in 1996 and that Claimant had worked from 1996 to 2008 despite their presence. (Tr. at 17). The ALJ noted that the treatment for Claimant's physical impairments had been routine and conservative in nature. (*Id.*). Records

27

indicated that Claimant's back pain was stable and did not prevent Claimant from performing his activities of daily living. (Tr. at 17–18). Similarly, the record demonstrated that Claimant's shoulder, knee, and hip pain did not limit his ability to engage in substantial gainful activity. (Tr. at 18). In view of the treatment records and Claimant's activities, the ALJ believed that Claimant had exaggerated his limitations. (*Id.*). Specifically, the ALJ noted that Claimant worked for over ten years after his back condition was first diagnosed and that Claimant did not take any narcotic medication for his pain. (*Id.*). Further, the ALJ discussed multiple inconsistencies in Claimant's explanation for his decision to stop working. (*Id.*). The ALJ proceeded to review records related to Claimant's mental impairment and the findings of state agency experts, all of which supported the conclusion that Claimant was not fully credible and was not disabled. (Tr. at 18–20).

Thus, contrary to Claimant's contention, the ALJ considered Claimant's subjective complaints of pain as required by the Regulations and case law. (Tr. at 16–17). Claimant argues that, in the absence of objective methods of measuring pain, "the ALJ must rely on [Claimant's] subjective pain to determine its effects on [Claimant's] residual functional capacity so long as that pain is reasonable in light of the objective medical evidence." (ECF No. 7 at 5). Here, the record indicates that Claimant received only conservative medical treatment and his activities of daily living were relatively unchanged by his physical and mental impairments. In light of this objective medical evidence, Claimant's subjective complaints of pain were simply not reasonable.

Claimant's testimony was "inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain that the claimant alleges

[he] suffers." *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Despite Claimant's contention that he was unable to work, no treating physician or state agency expert found that Claimant was unable to engage in substantial gainful activity. Claimant's treatment throughout the relevant time period was essentially the same as it had been in the preceding years. Claimant's chronic medical conditions were regularly monitored and required no significant changes in his treatment course. No treating health care provider recommended surgery, physical therapy, or assistive devices. No provider encouraged Claimant to limit his daily activities in any way or suggested that he should quit working. Following the alleged disability onset date, Claimant rated his pain as a zero on several occasions and never more than a six out of ten at its worst. (Tr. at 484, 494 553). On the single occasion that Claimant rated his pain as a six, he was still recovering from an automobile accident. After receiving instruction on home exercises, Claimant's shoulder pain subsided. Moreover, he admitted receiving satisfactory relief from his pain with the use of over-the-counter medications like Naproxen and never required narcotic pain relievers.

Furthermore, state agency physicians found Claimant to be only partially credible because the medical evidence did not substantiate the degree of severity, persistence, and intensity alleged by Claimant. An ALJ is entitled to afford significant weight to the opinion of a state agency non-examining psychologist or physician: agency regulations specifically provide that state agency medical consultants "are highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i). Thus, the ALJ reasonably found Claimant's credibility to be poor to the extent that Claimant's testimony was contradicted by the objective medical record, and his daily activities. *Hines*, 453 F.3d

at 565 n.3 (citing *Craig*, 76 F.3d at 595). Therefore, the undersigned **FINDS** that the ALJ's discussion of Claimant's subjective complaints of pain was sufficient and further **FINDS** that the ALJ's conclusions were supported by substantial evidence.

## VII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 8), **DENY** Plaintiff's Motion for Judgment on the Pleadings (ECF No. 7), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v.*

*Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**ENTERED**: June 22, 2012.

Cheryl A. Eifert
United States Magistrate Judge